E. A. STEWART, ADM'R, v. J. W. AND SOPHIA Y. FLINT.

[IN CHANCERY.]

*Grantor sometimes Competent and sometimes not. Burden of Proof. Mental Incapacity. Suit to set aside Deed. Mistake.*

1. When a grantor's mental incapacity is not permanent and continuous, but only by "spells," and the deed is not lacking consideration, nor obtained by fraud or other unfairness, and the act was reasonable and natural, the burden of proving incapacity at the time of the conveyance is on the party claiming that the deed is invalid.

2. And in such case, where the master found that the grantor, at the time of con-
veyance, was neither wholly incompetent nor, unaided, fully competent to
understand the nature of the transaction, but thought that, under proper
advice, which it did not appear she had, she could have understood it, and have
had papers drawn that would have effectuated her intention, the court refused
to set aside the deed, holding, from all the findings of the master, that it could
not be said that she did not understand, in a reasonable manner, the nature and
effect of what she was doing; and this, although the grantor intended to take
back an obligation for her support during life secured on the farm conveyed,
but, by mistake, got only a life lease. TAFT and ROWELL, JJ., dissent.

BILL IN CHANCERY. Heard on the pleadings and a special
master's report, February Term, 1886, Orleans County, Ross,
Chancellor. Decree that the defendants reconvey the premises
to the orator. The bill was brought to have set aside a deed
executed by the plaintiff's intestate, Mrs. Emily Clark, to the
defendant wife. When the suit was commenced, the plaintiff
was guardian of Mrs. Clark, who has since deceased. The bill
alleged the incapacity of Mrs. Clark, and that the defendants
procured the deed to be executed by taking advantage of her
insane condition, relationship, etc. The master found :

" The farm conveyed by the deed of June 14th was worth
from twelve to fifteen hundred dollars. No consideration was
then paid for said deed, but the defendants at the same time,
and as a part of the same transaction, executed back a life lease
of the farm. I find from the defendants' witnesses that instead
of a life lease it was the understanding that the defendants
should support Mrs. Clark, doing all things necessary therefor
during her natural life, but no written obligation of that kind
was ever given. The life lease only conveyed to Mrs. Clark
the use of the farm during her life. At that very time the
farm was under a lease to Damon Y. Clark, a son, on an agree-
ment that he should support her for the use of it. Damon was
then carrying on the farm under that agreement for that year,
and had taken Mrs. Clark to his home away from said farm.
The farm had been carried on under a like arrangement first by
her son Frank for about two years commencing in 1877, and
then by the defendants from January, 1879, to April, 1881,
and from the last-named date by Damon. Damon had rented
the house, but carried on the farm himself. Mrs. Clark at this
time, that is of the deed, was seventy-six or seventy-seven
years old. A daughter of the defendants went to Damon Clark's
on June 6th, 1882, on other business, and Mrs. Clark went

home with her, and remained until the next October. The deed was executed in about a week after Mrs. Clark went home with the daughter. The daughter was the only witness as to whether anything was said about the deed before it was executed. She testified that her grandmother, Mrs. Clark, spoke to her the night before the deed was executed, and said she was going to execute the deed of her farm to her mother if she would take it, that it belonged to her, that that night or the next morning she spoke to her mother about it, and her mother went and got Mr. Rogers the next morning to come and make the conveyance and life lease. She testified that she did not know of anything more being said before the deed was given. There is no direct testimony to contradict this testimony of the daughter. The defendant, Mrs. Sophia Y. Flint, went and employed Mr. Rogers to make the papers, and told him what they were to be, and gave him all the directions that were given to him. Mr. Rogers went to Mr. Flint's house that afternoon and wrote out the deed and life lease without conferring with Mrs. Clark about them. After the papers were made he read them in the presence of Mrs. Clark, and she approved of them, executed the deed, and the defendants executed the life lease back. The defendants claim that although there was no money consideration paid for the deed, that there was an equitable consideration growing out of the fact that Mrs. Flint before marriage had worked in the factory and earned money and sent it home to her parents. I find that notwithstanding Sophia, now Mrs. Flint, was thus settled with in full, both Mr. and Mrs. Clark, her father and mother, felt that her aid at the time and under the circumstances was the foundation of all that they afterwards accumulated. The sons were not particularly helpful in accumulating property, and the contrast was marked and frequently spoken of. There always existed a feeling of gratitude on the part of the father and mother towards Mrs. Flint for the aid she so timely furnished. * * * But on a careful analysis of the latter class of witnesses, I find that several of the witnesses only saw and conversed with her a few times, never having known her but a short time, and others who had kown her longer and more intimately, only conversed with her concerning matters which happened several years before, and in her early married life, in regard to which her memory seemed quite retentive and accurate. Hence, on careful consideration of the whole testi-

mony, I think it is fairly established, and I find that from about 1877 or 1878 she had spells when she had pain in her head, when she was partially, and at times fully, incapacitated from apprehending or doing any business; that these spells were due probably to a gradual softening of the brain; that at her best she was not what she used to be intellectually, but there was a gradual failing and loss of intellectual power. This was manifested by a frequent repetition of the same question or same event, showing that her memory was not active or retentive of passing events, while it would reproduce early events accurately. In regard to her mental condition on the day the deed was executed, the testimony is in sharp conflict. The answers and the testimony of the daughter indicate that she suggested the giving of the deed, and that she fully comprehended the business to be transacted in all its bearings, and that it was only carrying out a long-cherished plan. The testimony of Mr. Rogers, who wrote the deed and life lease, is not very decisive either way, as he had very little conversation with the intestate. The testimony of Mrs. Wilcox, a neighbor, who was present part of the time while the writings were being drawn up, indicates clearly that she did not comprehend the nature of what she was doing. Testimony of subsequent talks with the intestate in regard to the transaction show that at times she stated clearly what she had done, and at other times she could give no intelligent account of it or denied having given the deed. A careful consideration of all the testimony bearing upon her mental condition that day leads to the conclusion that she was neither wholly incompetent, nor, unaided, fully competent, to understand and comprehend the nature of the transaction she was engaged in, and I so find. There is no balance of testimony to establish that she was having one of her bad spells that day, nor, if the burden is on the defendant to establish she was not in one of her bad spells, is that fairly established. I do not think that she was capable of herself to comprehend fully the transaction, but I think under proper, impartial advice she could have understood it and have had papers drawn that would have effectuated her intention. I think her intention was to convey the farm to Mrs. Flint and take back an obligation secured upon the farm for her support during life. I think this intention was formed because the sons had never been particularly helpful in acquiring the property, and she had lived with two of them unsatisfactorily, because

they were less thrifty in property matters than she thought they ought to be ; and she had an idea they did not treat her as well as they ought ; and her intellect and mental faculties were in that peculiar condition attendant on a failing mind that she remembered distinctly and forcibly the energy and helpfulness of Mrs. Flint in earning and furnishing money when they most needed it, and she entertained undue regard for and confidence in her, in comparison with her other children. Mrs. Flint had also been with her a good deal and helpful to her since her husband's death, and latterly had been claiming that she had not been fully paid. The intestate and Mrs. Flint stood in very intimate confidential relations. In her enfeebled condition of mind she was ready and willing to trust Mrs. Flint to the fullest extent without security, and Mrs. Flint was aware of this unlimited confidence. There is no direct testimony that Mrs. Flint suggested or urged the giving of the deed. I think and find it was the suggestion of the intestate. Yet, as early as 1878, Mrs. Flint was, with her mother's approval, soliciting various persons to accept the office of guardian of the intestate, because she feared that in some of her bad spells she would convey the property to one or more of the sons, and she should fail to receive her due proportion or share of the same. I am satisfied and find that Mrs. Clark never would have conveyed the farm to Mrs. Flint and taken back a life lease of it, if she had fully comprehended what she was doing. On the defendant's testimony on the same day, she told what disposition she was going to make of all her other property, so that, as she then looked at it, all she would have for her future support was the life lease. In coming to the foregoing conclusion from the evidence, I have considered the evidence of the judge of probate and an attorney for and against the appointment of a guardian at the hearing September 29 or 30, 1882, in regard to their interview with Mrs. Clark on that occasion, and what they all judged to be her then mental condition. The testimony of the judge of probate was received against the exception of the defendants. I also considered the fact of the adjudicaton that she was incapable of taking care of her property, and appointment of a guardian unappealed from, growing out of that hearing, not as *prima facie* evidence that she was thus incapable, when the deed was given, but as proper evidence to be considered in determining her mental condition on the day the deed was executed."

*J. L. Lewis, J. C. Burke* and *C. A. Prouty*, for the defendants.

Transactions like this have been sustained by many courts. *Howe* v. *Howe*, 99 Mass. 88; *Hadley* v. *Latimer*, 3 Yerger, 537; *Nace* v. *Boyer*, 6 Casey, 99, 111; *Darnell* v. *Rowland*, 30 Ind. 342; *Harrison* v. *Guest*, 6 DeG. M. & G. 424.

"The mere fact that a person is of weak understanding, whether from age, accident, or disease, if there be no fraud or imposition, is not an adequate cause for relief." *Nace* v. *Boyer*, 6 Casey, 99. If Mrs. Clark had sufficient mind to know what property she had, and what she wished to do with it, and what she in fact did with this farm when she made this conveyance, the deed should stand. *Graham* v. *Pancoast*, 30 Penn. St. 89; *Aiman* v. *Stout*, 6 Wright, 114.

The burden of proof is upon the orator. He must make out that his intestate was incompetent when she gave the deed. This he may do by proving that she was insane habitually, or by showing that she was insane at this particular time. The kind of insanity which when once proved is presumed to continue, must be of a continuing kind. *Hicks* v. *Whittemore*, 4 Met. 545; *Hatley* v. *Webster*, 21 Me. 463; *Trish* v. *Newell*, 62 Ill. 196; *Carpenter* v. *Carpenter*, 8 Bush (Ky.) 284; Red. Wills, s. 92. The crucial test in all these cases is the quality of the act itself. If the act be rational, then the person who has performed it will be presumed to be rational, although the contrary may be shown. 1 Jar. Wills, 37, 69; *Cartwright* v. *Cartwright*, 1 Phill. 90.

*Edwards, Dickerman & Young*, for the orator.

A conveyance will be set aside if it is shown that the grantor, at the time, had not sufficient understanding to know the nature and consequences of his act. *Day* v. *Seely*, 17 Vt. 542; *Doty* v. *Hubbard*, 55 Vt. 278.

The contracts of persons of weak understanding, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclu-

sion that the party has not exercised a deliberate judgment, but that he had been imposed upon, circumvented or overcome by cunning or artifice or undue influence. *Mann* v. *Betterly*, 21 Vt. 326 ; *Harding* v. *Handy*, 11 Wheat. 125. Taking an unfair advantage of another's weakness of mind is undue influence, and the law will not permit the retention of an advantage thus obtained. 11 Reporter, 152. When a person from mental weakness is likely to be influenced by others, transactions entered into by such person, without independent advice, will be set aside, if there is any unfairness in them. *Allore* v. *Jewell*, 94 U. S. 506.

In the case last cited Justice FIELD says : " The question presented for determination is, whether the deceased, at the time she executed the conveyance in question, possessed sufficient intelligence to understand fully the nature and effect of the transaction." *See* 2 Mason, 378 ; *Eaton* v. *Eaton*, 37 N. J. L. 108.; BEASLEY, Ch. J., in *Lozear* v. *Shields*, 23 N. J. 511 ; *Hill* v. *Day*, 34 N. J. Eq. 150 ; *Earl* v. *Hosiery Co.* 36 N. J. Eq. 188 ; Chit. Con. 130 ; Shelford on Lunacy, 266 ; *Dennett* v. *Dennett*, 44 N. H. 53 ; *Converse* v. *Converse*, 21 Vt. 168.

In the case of contract between parent and child, the law, in order to prevent undue advantage from the unlimited confidence, affection or sense of duty which the relation naturally creates, requires the utmost degree of good faith between the parties. Story Eq. ss. 218, 238, 323 ; *Gibson* v. *Jeyes*, 6 Ves. Jr. 273 ; *Clarkson* v. *Hanway*, 2 P. Wms. 203. Fraud will be presumed in a case like this one. *Chesterfield* v. *Janessen*, 2 Ves. 155 ; 2 Phil. Ev. (C. & H. Notes) 301 ; *Galtatian* v. *Cunningham*, 8 Cow. 207 ; *Conant* v. *Jackson*, 16 Vt. 350.

A written instrument which expresses a contract consummated by any superior influence or advantage of position or relation which one of the contracting parties had and held over the other—so that they did not contract at arm's length—may be set aside as being unconscionable, unfair or fraudulent.

POWERS, J., in *Bailey* v. *Woodbury*, 50 Vt. 169. See *Harrington* v. *Grant*, 54 Vt. 240; Chit. Con. 977; *Hugenin* v. *Baseley*, 14 Ves. Jr. 273; 2 Lead. Cas. Eq. (W. & T. Notes) 556, 583, 1193. The burden was on the defendants to prove that the transaction was righteous, and that the donor voluntarily and deliberately did the act, knowing its nature and effect. *Todd* v. *Gove*, 33 Md. 183, 194; 2 Lead. Cas. Eq. (W. T. Notes) 1195; 1 Dan. Ch. (4th ed.) 852; *Parker* v. *Parker*, 4 Cen. Rep. (N. J.) 67; *Parfitt* v. *Lawless*, 4 Eng. Rep. (Moak's Notes) 692. Lunacy being established, the proof is thrown upon the party alleging a lucid interval, and he must establish, beyond a mere cessation of the violent symptoms, a restoration of mind sufficient to enable the party soundly to judge of the act. *Hall* v. *Warren*, 9 Ves. Jr. 605.

If derangement or imbecility be proved or admitted at any particular period, it is presumed to continue until disproved, unless the derangement was accidental, caused by a disease. 1 Greenl. Ev. s. 42; 2 Ib. s. 689; *Hicks* v. *Whittemore*, 4 Met. 545; 3 Stark. Ev. 1709; 4 Greenl. Cruise, 412; *Judge of Probate* v. *Stone*, 44 N. H. 594.

The opinion of the court was delivered by

ROWELL, J. The deed in question was given on June 14, 1882, and it appears—among other things—that from about 1877 or 1878, the intestate had had spells of pain in her head—probably due to a gradual softening of the brain—when she was partially, and sometimes wholly, incapacitated from apprehending or doing any business; and at her best she was not intellectually what she used to be, but was gradually failing and losing her intellectual power. The master does not find that she was having one of her "bad spells" the day the deed was executed, nor, if the burden was on the defendants to show it, that she was not having one; but he does find that she was then neither wholly incompetent, nor, unaided, fully competent, to understand and comprehend the nature of the transaction she was engaged in when she gave the deed. He thinks—and

it is treated that he finds—that under proper and impartial advice—which it does not appear she had—she could have understood it, and have had papers drawn that would have effectuated her intention, which was to convey the farm to Mrs. Flint, and take back an obligation for her support during life, secured on the farm; and this intention was formed because she remembered the past to the disadvantage of her sons as compared with her daughter. The giving of the deed was her suggestion, and it does not appear that either Mrs. Flint or any one on her behalf ever said anything to her about it; but the master finds that she never would have conveyed the farm to Mrs. Flint and taken back a life lease of it if she had fully comprehended what she was doing.

This deed is not regarded as unreasonable, nor as lacking consideration, nor as having been obtained by fraud or other unfairness.

It was reasonable and natural that the intestate should desire to secure her support with a daughter who had always been so kind and helpful to her, and of whom she thought so much; and had her support been secured as the intention was, it certainly would afford sufficient and adequate consideration to uphold the deed as between the parties; and equity would probably have compelled its security as intended.

The case then comes to this : Upon the finding of the master, is it to be held that the intestate was mentally incapable of making the deed in question?

As to the measure of her capacity, the rule is that she must have had enough to enable her to understand and comprehend in a reasonable manner the nature and effect of the business she was doing. *Lozear* v. *Shields*, 23 N. J. Eq. 509; *Hill* v. *Day*, 34 N. J. Eq. 150; *Day* v. *Seely*, 17 Vt. 542; *Gore* v. *Gibson*, 13 M. & W. 623; Story on Sales, ss. 10, 12; 1 Benj. on Sales, s. 32.

Her mental incapacity not being permanent and continuous, but only by " spells," and the act being reasonable and natural, the burden of proof was on the plaintiff to show incapacity at

Stewart *v.* Flint.

the time in question, which he has failed to do ; for the intestate understood her relation to her children, was mindful of their merits and demerits, knew of what her property consisted, suggested the giving of the deed, *intended* to convey her farm to Mrs. Flint and have her support secured upon it—but by a very natural mistake, especially among laymen, got only a " life lease," which is the current term of the common people to express what these parties intended—told what disposition she was going to make of all her other property, and looked at it that the life lease was all she was going to have for her support.

On these and the other findings it cannot be said that she did not understand and comprehend in a reasonable manner the nature and effect of what she was doing when she gave the deed, and so the deed must stand.

This view renders it unnecessary to consider whether the inquest of lunacy was competent evidence or not.

Decree reversed and cause remanded, with mandate that the bill be dismissed with costs.

TAFT and ROWELL, JJ., dissent, thinking the findings based on competent evidence, and that, in the circumstances, it appearing that the intestate was not fully competent without the aid of proper and impartial advice to understand the *nature* of the transaction she was engaged in at the time she gave the deed, it devolved upon the defendants to show that she had such advice, and did understand the nature of the transaction. Mr. Pomeroy says that in cases of real mental weakness a presumption arises against the validity of the transaction, and that the burden rests upon the party claiming the benefit of the conveyance to show its perfect fairness and the capacity of the other party.    2 Pomeroy's Equity, s. 947.