## CLARK KING v. TIMOTHY DAVIS, ADM'R, AND A. O. CUMMINGS, ADM'R.*

[IN CHANCERY.]

*Mental Capacity.    Undue Influence.    Expectancy.*

To make a binding contract a party must possess capacity enough to understand and comprehend both the nature and effect of the transaction. Thus, the assignment of an expectancy will be set aside when executed by a woman whose mind was so impaired by age that, while she understood the effect of the assignment, she did not its nature, and who was not able to distinguish her own debts from those of others, or to discriminate whether in equity they belonged to her to pay; and when undue influence was exercised to procure the assignment.

BILL of interpleader.  Heard on the report of special masters, September Term, 1886.  POWERS, Chancellor.  Affirmed.

It was decreed that the assignment executed by Polly Gould and John Gould to the said A. O. Cummings, administrator of Henry M. Cummings, of their expectancy in the estate of Lucinda Cutler, mentioned in said report, be set aside and held for naught; and that the defendant Davis, administrator of Polly Gould's estate, is entitled to the fund paid into the court by the orator, with its accumulations, and the same is decreed to him to hold as assets of said Polly's estate, and that the defendant Davis is entitled to recover his costs against the defendant Cummings, to this date.

The masters found:

"David Gould deceased some time in the fall of 1861, leav-- ing a will whereby he bequeathed to his wife, Polly, a life estate in his home farm in East Montpelier, and to his son,

* Heard May Term, 1887,

Davis *v.* Cummings.

John Gould, 2d, the remainder, subject to the payment by John of certain other legacies therein named. From David's decease to the death of John, some time in the spring of 1883, Polly and John occupied the farm together, John never having married; and, after the death of John, Polly remained upon the farm until late in the fall of the same year, when she was removed to Montpelier into the family of a grandson-in-law, where she remained until her death, June 29, 1884, at the age of ninety-three years, lacking a month.

"Lucinda Cutler, a sister of Polly Gould, deceased April 4, 1874, leaving a will providing that the residue of her estate, after the payment of all other legacies, should remain in the hands of her executor, or, in case of his death, resignation, or inability, in the hands of a trustee to be appointed by the Probate Court, for a term of ten years after her decease, after the expiration of which term said residue with its accumulations ' to go and descend to her legal heirs to be divided according to law;' which will was duly probated, and Addison Peck appointed executor, who administered for a time and was succeeded by Clark King, duly appointed administrator with the will annexed.

"April 30, 1872, Polly and John mortgaged said farm to Lucinda Cutler, to secure their note of that date for the sum of $700, signed by Polly and John. August 22, 1873, Polly and John again mortgaged the farm to H. W. Heaton to secure two notes of that date, one for the sum of $720, one for the sum of $115, and a note of April 29, 1873, for the sum of $103.50, all signed by Polly, and the first and last named by John. The $115 note was witnessed; both these smaller notes were given for personal property, named in the notes, by said Heaton bid off at sheriff's sale upon executions against John, at the request of Polly and John, at the dates of the notes respectively; and a lien was reserved in the notes on the property in each note named. This mortgage also covered a piece of land in Montpelier known as the ' Somerby Place,' of which Polly then owned an undivided half. August 22, 1873, Polly and John again mortgaged said home farm to Dennison Taft to secure a note of that date for the sum of $790, signed by Polly and John; which debt it appeared was incurred for improvement of the buildings on the place. September 19, 1874, John executed still another mortgage of the farm to Avery Cummings to secure a note of that date, signed by him, for the sum of $800.

Davis *v.* Cummings.

" The mortgage to Dennison Taft, at some time after its execution, came into the hands of William N. Peck and was by him foreclosed at September Term of Washington County Court of Chancery, 1875, at which term decree was passed with one year's redemption expiring November 10, 1876. Neither Polly and John nor Cummings redeemed, and the decree became absolute as against Polly and John and Avery Cummings. Soon after the decree became absolute, Henry M. Cummings purchased the rights of said Peck, taking from him a quit-claim deed of the farm, dated May 3, 1877; and March 1, 1877, said Henry M. also received a deed from Polly and John of the Somerby Place—a quit-claim deed. The foreclosure against Polly and John bereft them of all their property, save, perhaps, a small amount of personal property and their interest in the Somerby Place, subsequently conveyed to Henry M. as above set forth. They were poor.

" The encumbrances prior to the Taft mortgage still existed ; and Henry M. paid to the executor of Lucinda Cutler and to said Heaton their claims, and so secured to himself absolute title to the farm. The amount of encumbrances, including the decree, at the date of the expiration of the decree was $3,019.43.

"After Henry became the owner of the farm in the manner above narrated, Polly and John continued to occupy the farm just as they had done before, presumably under some arrangement with Henry M. ; but what that arrangement was cannot be stated, as there was neither writing nor living witness produced with definite knowledge to tell ; nor can it be ascertained whether an arrangement of some kind was made before or after Henry M. purchased the Peck decree, or whether he purchased the decree by the procurement of Polly and John or at his own motion. All that was shown about this is learned from defendant, A. O. Cummings, who was a witness in his own behalf, and who had some knowledge, in a general way, of his brother Henry's affairs ; and he supposes the arrangement to have been that Polly and John were to pay Henry M. 6 per cent. on the money invested by him in the farm, and were permitted to stay there at the sufferance of Henry M. he being the absolute owner.

" Henry M. Cummings deceased about August 8, 1881, and immediately thereafter A. O. Cummings was duly appointed administrator of his estate. Among Henry M. Cummings' papers, his said administrator found the two smaller notes

Davis *v.* Cummings.

described in the Heaton mortgage, and a note for the sum of $1,000, dated December 1, 1876, payable to Henry M. on demand, signed by Polly and John, and witnessed by F. V. Randall, The note was called in the trial 'the Randall note.' The $115 Heaton note was payable to Heaton or order, and when found by A. O. Cummings did not bear Heaton's indorsement. A. O. Cummings procured Mr. Heaton to indorse this note without recourse after Henry's death and after the making of the assignment hereinafter spoken of. Within two or three days after the death of Henry M., A. O. Cummings, having then been appointed administrator, went up to the farm and had an interview with John about these matters, and also made some general talk with Polly about her remaining on the farm, and about paying for the use of farm. Subsequently A. O. Cummings had two or more interviews with John at Montpelier in relation to the business, and it was suggested that John and his mother make an assignment of their expectancy in the estate of Lucinda Cutler, to secure the said Cummings for the past indebtedness and for their future occupancy of the farm; and so it was arranged between Cummings and John that Cummings should come up to the farm and have writings executed to accomplish that purpose. According to this arrangement with John, on December 13, 1881, a time previously agreed upon between Cummings and John, Cummings with a lawyer repaired to the farm to consummate the business. On that day, at the farm, Polly and John executed to A. O. Cummings, as administrator of the estate of Henry Cummings, in writing, under seal, an assignment of all their interest in the estate of Lucinda Cutler, with power of attorney to receive and receipt for such sum as should be coming to them, or either of them, from the administrator of Lucinda Cutler's estate, to an amount sufficient to pay said Cummings the indebtedness therein named. The indebtedness named in the assignment is the said Randall note, the said two smaller notes named in the Heaton mortgage, a note of $1,250 that day executed by said Polly and John to A. O. Cummings, administrator, and such further indebtedness as should arise under a lease of the farm that day, executed and hereinafter more particularly described. At the same time A. O. Cummings, administrator, executed to Polly a lease of the farm from that time to the first day of April, 1884—about the time the ten years after the death of Lucinda Cutler would expire—with a provision that it should terminate at all events with the death of Polly, at the annual rental of $175.

"After Polly's death, A. O. Cummings sold the home farm at forced auction sale for the sum of $2,550, a sum which he testifies was ' a good deal less than its value,' though he got all he could for it, after making diligent effort to get more at private sale. After Polly's death, Timothy Davis was duly appointed administrator of her estate. Said Davis claimed from Clark King, administrator with the will annexed of Lucinda Cutler, whatever was coming to Polly as heir of Lucinda Cutler; and A. O. Cummings, administrator, claimed the same by virtue of said assignment. Thereupon King brought the bill in this case, and the court ordered the said Davis and Cummings to interplead, and these masters were appointed to hear them. King has paid into court the fund here in controversy, being the sum of $3,370.80.

" Davis charges mental incapacity on the part of Polly at the time of the execution of the assignment, and, upon this charge of mental incapacity rests the issue in the case. Upon either side of this issue was introduced a great number of witnesses, who gave their opinion respecting Polly's mental and physical condition during the last ten years of her life, with more or less detail of her circumstances and surroundings.

" From this testimony is found: Up to within fifteen years of her death, Polly was a woman of more than ordinary business capacity and understanding. John was her only living son; and for him she entertained great affection, and in him had great confidence. He was addicted to the excessive use of intoxicating liquor, and was 'easy going' and shiftless. They lived together upon the farm, John having the outdoor and financial management of affairs, and Polly managing indoors, herself doing such work as she was able, which for the four or five years next before John's death, was very little. John became in his later years so shiftless that he neglected to cut all the hay, and even gathered fence for firewood. His careless and unthrifty management of the farm and their financial affairs—his shiftlessness—brought them to a condition of poverty in 1875, when they were foreclosed as hereinbefore set forth, notwithstanding that, with ordinary industry and management, the farm would have afforded them an abundant living.

" Notwithstanding this, Polly's confidence in John was unshaken. After the foreclosure, and up to John's death, his utter worthlessness was apparent to all but his mother. Polly herself loved strong drink, and sometimes partook of it to

Davis *v.* Cummings.

intoxication.   John ministered to his mother's desire in this behalf, and furnished her with her ' warm drink,' as she called it.   The masters think that this attention on his part in no wise diminished her affection for or confidence in him.   In 1883, during John's last sickness, some of the neighbors called the attention of the overseer of the poor of the town to the fact that Polly was in need, whereupon he, with one of the selectmen, went to the farm to look into the matter, and interviewed Polly respecting her needs and situation.   Polly insisted to them that she had everything she wanted except that, since John had been sick, she had no one to bring her her warm drink.   The fact is that at that time she was not comfortably provided for.   The overseer at that time did nothing for her relief, and, as far as appeared, never did.   This was after the execution of the assignment, but her condition of mind then was not substantially different from what it was at the time of the assignment.   Polly was induced to execute the assignment by John.   Cummings' negotiations were mostly with John, and John influenced his mother."

The masters do not think that John himself, who was present that day, had a very intelligent comprehension of the details of that business, though it is not claimed that he was incapacitated from transacting business affairs.   It is not insinuated that Mr. Cummings intended any wrong, but it is stated that the making up of the $1,250 note was in a great measure " guesswork " on his part.   The masters entertain some doubt respecting the justice and equity of all the debts named in the assignment.   They do not quite understand why the two smaller notes named in the Heaton mortgage were kept on foot as a subsisting debt.   They were named in the mortgage, and, by Henry M. Cummings, paid when he redeemed the farm.   It did not appear that either Heaton or Henry M. ever relied upon the security named in the notes, themselves, or pursued that personal property, but it did appear that the property was lost sight of, and nobody knows what became of it, or when it was lost sight of.   The masters think the evidence warrants the presumption that John at some time disposed of it.

The circumstances surrounding the parties at and about the

date of the Randall note suggested to the mind of the masters some doubt as to whether Henry M. preserved that note as a subsisting debt against Polly and John. The evidence presents to the minds of the masters the conjecture that that note was given at the time Henry M. purchased the Peck decree, with a view, then entertained, but afterwards abandoned, that new notes should be given for all that Henry M. should pay out to redeem the farm, Polly and John still retaining an equitable interest in the property.

The other facts are sufficiently stated in the opinion of the court.

*S. C. Shurtleff*, for Cummings.

The question raised on the report is naturally divided into two parts : (1) How much mental capacity must a person possess to make a valid pledge of such person's property for the payment of debts? (2) How much mental capacity must a person possess, who at the time is without present means, to make a valid pledge of an expectancy, to enable such person to live without becoming a public charge?

It is found in this case that Polly Gould knew what she signed, and that it bound her expectancy to pay the debts named in the contract; and realized and knew the difference between one sum of money and another. The only infirmity found by the masters is lack of memory.

If Polly Gould understood what she was doing, and the effect of the act, as the masters have found in this case in reference to the assignment, of what consequence is it whether she understood other things reasonably or unreasonably?

Different men come to different conclusions upon the same state of facts, as to what is reasonable or unreasonable; that is, they differ in judgment. This is not a valid excuse for not performing a contract understandingly made.

The issue in this case is the same as in *Allore* v. *Jewell*, 94 U. S. 506 (24 L. ed. 260), in which the court uses the following language in stating the issue : " The question presented

Davis *v.* Cummings.

for determination is whether the deceased at the time she executed the conveyance in question, possessed sufficient intelligence to understand fully the nature and effect of the transaction; and, if so, whether the conveyance was executed under such circumstances as that it ought to be upheld, or as would justify the interference of equity for its cancellation."

The same doctrine is laid down in the case of *Harding* v. *Handy*, 24 U. S. 11 Wheat. 103 (6 L. ed. 429).

Imbecility or weakness of mind, not amounting to idiocy or lunacy, is not alone sufficient to avoid a deed. *Jackson* v. *King*, 4 Cow. 207; *Smith* v. *Beatty*, 2 Ired. Eq. 456.

Unless there is inadequacy of consideration, or some other evidence of fraud, imposition, or over-reaching, any degree of imbecility or insanity short of total business incapacity, will not suffice to avoid a contract. *Henderson* v. *McGregor*, 30 Wis. 78; *Darnell* v. *Rowland*, 30 Ind. 342; *Henry* v. *Ritenour*, 31 Ind. 136; *Hall* v. *Perkins*, 3 Wend. 626; *Odell* v. *Buck*, 21 Wend. 142; *Petrie* v. *Shoemaker*, 24 Wend. 85; *Person* v. *Warren*, 14 Barb. 488; *Hirsch* v. *Trainer*, 3 Abb. N. C. 274; *Clearwater* v. *Kimler*, 43 Ill. 272; *Sheldon* v. *Harding*, Id. 74; *Farnam* v. *Brooks*, 9 Pick. 212; *Beller* v. *Jones*, 22 Ark. 92; *Mann* v. *Betterly*, 21 Vt. 326.

The report finds that A. O. Cummings acted in good faith in this matter, so that there was no over-reaching or anything to put a prudent man on inquiry.

Absolute soundness of mind is not necessary to enable one to make a valid conveyance. It is sufficient if the mind comprehend fully the import of the particular act. *Rippy* v. *Gant*, 4 Ired. Eq. 443; *Miller* v. *Craig*, 36 Ill. 109; *Dennett* v. *Dennett*, 44 N. H. 531; *Hovey* v. *Hobson*, 55 Me. 256; *Speers* v. *Sewell*, 4 Bush, 239; *Creagh* v. *Blood*, 2 Jones & La. T. 509; *S. C.* 8 Ir. Eq. 434.

*Senter & Kemp* and *Pitkin & Huse*, for Davis.

As to the measure of her capacity, the rule is that she must have had enough to enable her to understand and comprehend

in a reasonable manner the nature and effect of the business which she was doing, as stated in *Stewart* v. *Flint*, 1 Vt. (L. ed.) 274, 4 New Eng. Rep. 120, 59 Vt. 144; or, as stated in *Hill* v. *Day*, 34 N. J. Eq. 150, approving *Lozear* v. *Shields*, 23 N. J. Eq. 509, " Where there is no reason to suspect fraud, the test, where mental incapacity is charged, is : Did the person whose act is challenged possess sufficient mind to understand in a reasonable manner the nature and effect of the act he was doing, or the business he was transacting ?"—or, as Lord HALE would have put it, " Did she know what she was about ?"

I. The whole case shows Polly's condition at the time of the assignment to have been one of great and real mental weakness, and, " in a case of real mental weakness, a presumption arises against the validity of the transaction ; and the burden of proof rests upon the party claiming the benefit of the conveyance or contract, to show its perfect fairness and the capacity of the other party." 2 Pom. Eq. Jurisp. s. 947 ; *Baker* v. *Monk*, 33 Beav. 419 ; *Wartemberg* v. *Spiegel*, 31 Mich. 400 ; Bigelow, Fr. 282 ; Kerr, Fr. 189, 190 ; Bailey, Onus Probandi, 353.

II. But if the statement quoted from Mr. Pomeroy is, without some element added thereto, too broad in any respect, the facts of this case supply the necessary additional element. It may be said, and certainly nothing more can be said, that, in addition to real mental weakness—which is all that Mr. Pomeroy names—there must be substantial inadequacy of consideration, or undue influence, or certain fiduciary relations between the parties. With any one of these three elements added, Mr. Pomeroy's statement cannot be considered too broad.

Among the relations named above as fiduciary, which include all those where there is influence on one side and confidence on the other, are those of parent and child, guardian and ward, attorney and client; as well as others of a class yet open, regarding which it was said by Lord CHELMSFORD in

*Tate* v. *Williamson*, L. R. 2 Ch. App. Cas. 55, quoted in 2 Pom. Eq. Jurisp. s. 956 : " The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of the most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise."

Mr. Pomeroy says, in the above section : " We are now to view fiduciary relations under an entirely different aspect; there is no intentional concealment, no misrepresentation, no actual fraud. The doctrine to be examined arises from the very conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions between the two parties, yet, because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption." It should be noted that the application of this principle is made purely upon the fact of the fiduciary relation, and, indeed, Mr. Pomeroy says that where this relation exists the existence of " mental weakness, old age, ignorance, pecuniary embarrassment, and the like" is " incidental, not necessary ;" but we suggest that, where they exist to the extent shown in this case, they form a very important " incident."

III. The report finds " Polly was induced to execute the assignment by John. Cummings' negotiations were mostly with John, and John influenced his mother." We claim that this, with what is elsewhere found in the report, may be taken to be a finding of undue influence by John, with the effect of which Cummings was chargeable.

The following cases show that even imputed undue influence

would put this burden on Cummings; much more is it put on him by the direct findings: 3 Lead. Cas. Eq. 123; 27 Moak, Eng. Rep. 417, note; 32 Moak, Eng. Rep. 321, note; *Huguenin* v. *Baseley*, 14 Ves. Jr. 273; *Maitland* v. *Irving*, 15 Sim. 437; *Maitland* v. *Backhouse*, 16 Sim. 58; *Espey* v. *Lake*, 10 Hare, 261; *Archer* v. *Hudson*, 7 Beav. 551; *Cooke* v. *Lamotte*, 15 Beav. 234; *Hoghton* v. *Hoghton*, Id. 278; *Blackie* v. *Clark*, Id. 595; *Cobbett* v. *Brock*, 20 Beav. 524; *Berdoe* v. *Dawson*, 34 Beav. 603; *Baker* v. *Bradley*, 7 De G. M. & G. 597; *Lyon* v. *Home*, L. R. 6 Eq. 655; *Kempson* v. *Ashbee*, L. R. 10 Ch. App. Cas. 15; *Bainbrigge* v. *Browne*, L. R. 18 Ch. D. 188; *Ross* v. *Ross*, 6 Hun, 80; *Leighton* v. *Orr*, 44 Iowa, 679; *Noble* v. *Moses*, 1 So. Rep. 217.

IV. But the burden is without question on Cummings, for the assignment was of an expectancy: One claiming under conveyance of an expectancy must show affirmatively its perfect fairness, and that a full and adequate consideration was paid. This Cummings has not done. 2 Pom. Eq. Jurisp. 953; 1 Story, Eq. Jurisp. 336; Bigelow, Fr. 274; *Bromley* v. *Smith*, 26 Beav. 664; Chitty, Eq. Index V. 3, 2794; Hill, Tr. 238; Adams, Eq. 5th Am. ed. 372; Bailey, Onus Probandi, 352.

The opinion of the court was delivered by

Ross, J. The contention is between the interpleading defendants, — Davis, as the representative of Polly Gould's estate, and Cummings, as the representative of Henry M. Cummings' estate,—and is, whether Polly Gould, December 13, 1881, possessed sufficient mental capacity to make binding the transaction then entered into by her with the defendant, A. O. Cummings. She was then nearly ninety years old, and her mental faculties much enfeebled and obscured. The measure of capacity required to make a binding contract was recently before this court sitting in full bench at the last General Term, in *Stewart* v. *Flint*, 59 Vt. 144. It is there held that the party must possess capacity enough to enable her

to understand and comprehend the nature and effect of the business she was doing. The masters have found that on the day of executing the assignment of her expectancy in her sister's estate " Polly's memory of recent events was seriously impaired, though better touching occurrences of her earlier years, as is said to be often the case with old people."

"·She was laboring under the impression that she was going to get the whole of the Lucinda Cutler estate, amounting to about $17,000, when the ten years expired; and although Mr. Cummings, in the interview when said·assignment was executed, told her that she would not, that the children of the brothers and sisters would share in it, she still persisted in the belief· that she would get the whole of it, and Mr. Cummings could not make her see otherwise. The inducement held out to her for executing the assignment was that she could remain on the farm, and her desire to do so with John, as her companion, was the consideration in her mind that obscured all others. She understood that the signing of those papers obligated her to the payment of the indebtedness named therein, and pledged her interest in her sister's estate for such payment. She could distinguish in her mind the difference between one sum of money and another; but she had not sufficient memory and mental vigor to understand, in a reasonable manner, whether she owed the debts named in the assignment, or whether, in justice and equity, she ought to pay them."

The statement of her capacity in this quotation from the report is not in substance changed nor varied by the other statements in the masters' report. While she understood the effect of the transaction in which she was engaged, did she understand and comprehend its nature? We think she did not. She did not comprehend, and, in her then condition, could not, whether she owed the debts she was binding herself to pay, nor whether they were of such a nature that in justice and equity she ought to bind herself to pay them. In other words, she had not sufficient mental capacity to distinguish her own debts from the debts of others, nor to discriminate

33

whether they were of such a character that they equitably and justly belonged to her to pay, or had a moral claim on her for payment. She was without determining capacity in herself, and the judgment which she once possessed was gone. She did not, and could not be made to understand her rights in her sister's estate; and her desire to be with her son John as her companion was a consideration in her mind that obscured all others, and that was the inducement held out to her for executing the assignment. This last indicated that undue influence was taken of her desire to be with John as her companion and partake of "the warm drink" which he furnished. Whether this undue influence was exerted by Mr. Cummings or John is left in doubt by the report of the master. But by which exerted, it controlled her rather than a reasonable comprehension of the nature of the transacaction—of the property she possessed, even in prospect, and of its application or assignment for the payment of her own debts or of the debts of others, which had some just and equitable claims upon her for payment—in executing the assignment. The assignment must therefore be set aside. Whether the estate of Henry M. Cummings has a valid claim against her estate for the use of the farm from December, 1881, to April, 1884, notwithstanding her incapacity to enter into a valid contract, is not presented for consideration, and no opinion is expressed in regard thereto.

The decree of the Court of Chancery is affirmed and the cause remanded.