JOHN M. ALLEN'S ADMR. v. LUCY J. ALLEN'S ADMRS., AND
LEE K. OSGOOD.

January Term, 1906.

Present:  ROWELL, C. J., TYLER, MUNSON, WATSON, HASELTON, and
MILES, JJ.

Opinion filed October 29, 1906.

*Husband and Wife—Bill to Set Aside Voluntary Conveyance
—Mental Incapacity and Undue Influence—Evidence—
Burden of Proof—Presumption Between Husband and
Wife—Master's Report—Review of His Findings—Mo-
tion to Recommit—Waiver of Objection—V. S. 939.*

A motion to recommit a master's report is addressed to the discretion
of the chancellor, and where no abuse of that discretion is shown,
his action thereon is not revisable.

Findings of a master will neither be reviewed nor revised where there
is evidence tending to sustain them, unless fraud or corruption
is shown.

Affidavits which fail to disclose all the evidence received by a master
upon which he made his report, are insufficient to set the report
aside on the ground that it is not supported by the evidence.

A master is not bound to report his decisions as to the admission or
exclusion of evidence, unless so requested in writing by the party
against whom the decision is made; in the absence of such request,
he may treat the objections as waived.

Objections so waived stand as if they were never in fact made before
the master, and will not be considered by the Supreme Court on
appeal.

While it is the better practice for a master to report all the facts upon
which he bases an ultimate finding, it is not legal error to omit to
do so, though the finding be a conclusion resulting from questions
of mixed law and fact.

To warrant a court of chancery in setting aside a contract on the sole
ground of the mental incapacity of one of the parties thereto, his
mental weakness must have been such as to leave him without
understanding sufficient to know the consequence of his act.

A hard bargain or inadequate consideration alone will not, ordinarily, justify the interference of a court of chancery; but an inadequate consideration, coupled with such a degree of mental weakness as would justify the inference that advantage has been taken of that weakness, is sufficient ground for equitable relief.

Where one person, by a voluntary instrument, gains a *great advantage* over another, the burden is on the former to show that the transaction is fair and honest; except that gifts or voluntary conveyances between husband and wife are presumed to be made as advancements.

In a suit in chancery to set aside a voluntary conveyance by a husband to his wife and certain contracts made by the husband and wife with her nephew, on the ground of the husband's mental incapacity and of undue influence exercised over him, the master's report examined, and *held* that the facts reported justified his ultimate finding of such mental incapacity and undue influence.

APPEAL IN CHANCERY, Rutland County, March Term, 1905, *Powers,* Chancellor.   Heard first on defendant's motion, supported by affidavits, to recommit the master's report.   Motion denied.   Then heard on bill, answers, and master's report. Decree, "That said deeds, power of attorney, and contracts described in the orator's bill of complaint, be set aside and adjudged to be null and void, and that the personal property, mortgage notes, and other promissory notes and evidences of indebtedness, and all choses in action described in said bill of complaint be, and the same are hereby decreed to the orators, and that said paper writings described in the amendments to said bill of complaint be, and they are hereby set aside and declared to be null and void, and that the said defendants be and are hereby ordered to account forthwith and surrender to the orators all sums of money that may have been collected, or that have come into their hands or possession belonging to the estate of the said John M. Allen, and that the defendants account forthwith, turn over and surrender to the orators the money, personal property, real estate and the proceeds thereof,

and all other property which came into the hands and posses-
sion of said Osgood, or of said Barrett and Danà, or either
of them, by virtue of said deeds, contract or power of attorney;
and also that the contracts said to exist between the said Os-
good and Edgar B. Moore be, and the same are set aside for
want of authority in said Osgood in respect to property therein
mentioned, and that the defendants and each of them be, and
they are hereby strictly restrained and enjoined from conveying
away, assigning, transferring or encumbering, either by deed,
mortgage, contract or otherwise, any of the real estate or per-
sonal property in said bill of complaint described, and that the
complainants recover of the defendants their costs, and that
they have execution therefor." The defendants appealed.

The reporter knows nothing about the affidavits mentioned
in the opinion, except what is therein stated. Besides the facts
stated in the opinion, the master reported the following: For
some years previous to January 13, 1889, John M. Allen and
Lucy Jane Allen, his wife, lived upon the farm then owned by
him in Rutland, Vt., and which he conveyed to his wife,
through Walter C. Dunton, on January 13, 1890, as herein-
after stated. John M. Allen died, intestate, November 1, 1893,
at the age of 77 years. His wife Lucy Jane, who was a few
years his junior, died, testate, February 15, 1892. Her will
is dated January 29, 1892, and was probated March 15, 1892.
The orators are J. A. Eayres and F. M. Butler and they are the
administrators of the estate of said John M. Allen. Defend-
ant Rockwood Barrett, one of the executors named therein,
was duly appointed executor of Lucy Jane Allen's will. The
other executor named in said will did not qualify, and defend-
ant, Edward Dana, was duly appointed administrator of her
estate with the will annexed. Defendant Lee K. Osgood is a
nephew of Lucy Jane Allen and one of the legatees named in

her will.   On January 13, 1890, W. C. Dunton, a brother-in-law of defendant Barrett, went to the Allen house and drew two deeds, one a warranty deed from John M. Allen to said Dunton of the major part of the latter's home farm in Rutland, and the other a quitclaim deed of the same premises from said Dunton to Lucy Jane Allen.   These two deeds were duly executed, and were left on the table at which Mr. Allen sat. Mr. Allen and said Osgood were present when the deeds were drawn and executed.   There was no evidence that these deeds or either of them were read to Mr. Allen, or that their contents were explained to him, or that he had previously talked about the matter with anyone.   Before the deeds were executed said Osgood brought said Dana to the house, and those two witnessed the signatures of both Dunton and Mr. Allen.   The consideration named in the deed from Allen to Dunton was "love and affection and $100.00," and in the deed from Dunton to Mrs. Allen, "$100."   No actual consideration passed between the parties to either of said defendants.   On this same day, January 13, 1890, said Dana—Osgood being present— talked with Mr. and Mrs. Allen about their making a contract with Osgood and giving him a power of attorney.   Said Dana then made memoranda, and afterwards drew these papers at his office, and they were both executed February 13, 1890.   The contract was signed by Mr. and Mrs. Allen and by said Osgood. The power of attorney was signed by Mr. and Mrs. Allen. The contract was, in part, a lease to Osgood of said home farm, stock and farming tools, except a portion of the land therein described which included the house and about three acres of land around it, and except such farming tools and stock as "said Allen and wife shall need in carrying on said reserved parcel, and shall designate and choose," and except such portion of the barns, until sold, "as they might actually require."

This contract was also an agreement on the part of Mr. and Mrs. Allen to convey by warranty deed to said Osgood, his heirs and assigns, said farm, stock and tools, excepting the reserved parts and rights above mentioned, for the sum of $13,000, "whenever and as soon as said sum of $13,000 shall have been paid to said Lucy Jane Allen, her heirs or assigns." Said contract further stipulated that Mr. and Mrs. Allen were to have the proceeds and products of said farm in lieu of interest, unless said Osgood chose to pay interest, and himself take the proceeds and products of the farm. Osgood agreed to carry on the farm in a good husbandlike manner; to keep an accurate account of the expenses in so doing, and to pay over to Lucy Jane Allen yearly the net income therefrom and to make no charge for his services. Said contract gave Osgood the right to lay out streets through said farm, to divide it into lots and to sell the same at such price "as shall be approved by said Allen and wife," and in part payment, to take mortgages exceeding two-thirds of the actual price of such lot or lots if "approved by said Allen and wife," and he was to pay over to said Lucy Jane Allen the receipts from sales, to be "applied towards said sum of thirteen thousand dollars." Said contract further stipulated that Mr. and Mrs. Allen were to execute and deliver to said Osgood a power of attorney so that he could make sales of said lots. Said contract also contained this paragraph:

"And whereas said Osgood is owing said John M. Allen three promissory notes and is owing said Lucy J. Allen one promissory note, which said notes are signed by him, said Osgood, now in consideration of the above agreement it is further mutually agreed that in case said Osgood shall succeed in selling said property for, the sum of thirteen thousand dol-

12

lars and for enough in addition thereto to pay his present indebtedness, other than said four notes, then the excess thereof, if any, shall be applied towards paying the interest due on said four notes on the first day of April, 1890, and if there shall not be sufficient to pay such interest in full, then the balance of such interest due April first, 1890, is to be endorsed and remitted as if paid, and if said Osgood shall not succeed in selling said property for sufficient to pay said sum of thirteen thousand dollars and his present indebtedness, other than said four notes, then all the interest on said four notes, due on the first day of April, 1890, is to be remitted and endorsed as paid."

The power of attorney authorizes Osgood to sign deeds of conveyance and carry out the terms of said contract. Osgood at once took possession of said farm under said contract and power of attorney, together with the stock and other personal property mentioned in said contract. No inventory of this property was made, nor was any value ever placed thereon. Mr. and Mrs. Allen continued to live in the house on said farm until they died. Mr. Allen had a tin trunk in which he kept his papers, and which was deposited in a closet off his bedroom. Mrs. Allen's papers were also kept in this trunk. Shortly after Mrs. Allen's death said Dana was at the Allen house with defendants, Barrett and Osgood, and inquired of Mr. Allen where her papers were. Thereupon the trunk was brought out and Mr. Dana took therefrom said two deeds, certain notes of Osgood to Mr. Allen, said contract, and other papers and securities of Mrs. Allen's and mortgage notes taken for the sale of lots, and carried them to his office.

On February 13, 1890, said Osgood owed Mr. Allen $3,000, specified in three notes of $1,000 each, and among the securities which Mr. Dana took from said trunk as aforesaid were these Osgood notes. In the summer of 1893 said Dana

separated the papers of Mr. Allen from the papers of Mrs. Allen, keeping the latter as her administrator, and returned to Mr. Allen, at his request, certain of his papers, including said two deeds and said Osgood notes, which were put into said tin trunk.    Said Osgood took these three notes from the Allen house about June 1, 1893.    Mr. Allen was then present, but there was no evidence that the notes were handed him by Mr. Allen, or by any other person, or that Mr. Allen then or afterwards knew that they had been taken.    About the time that Mr. Allen died Osgood took said tin trunk with its contents to his house and also took some other papers which were found in Mr. Allen's desk.

On March 10, 1890, said Osgood made a contract with one Moore, a real estate agent in Rutland, to divide said farm into lots and sell them, "except the wood lot and three acres around the house"; terms, 5 per cent. on sales up to $16,000, and after that amount had been sold one-half of the gross receipts.    At first said Moore supposed he was making a contract with Mr. and Mrs. Allen, and put their names in a written agreement, but afterwards struck their names out and inserted the name of Lee K. Osgood.    Mr. and Mrs. Allen never knew the terms of the Moore-Osgood contract; nor did Moore know the terms of the Allen-Osgood contract.    Moore made sales of these lots for prices aggregating more than $16,000, all of which was paid in cash and in mortgage securities on the several lots sold.    Osgood signed the deeds conveying said lots. The mortgages were taken to Lucy J. Allen, and the proceeds paid to her while she lived, and after her death the proceeds from the sales were turned over to said Barrett and Dana.

On May 7, 1889, Mr. Allen had what his friends called "a shock," but what the master finds to have been "a hemorrhage on the right side of the occipital lobe, and a paralysis

of the inner side of both eyes caused by this hemorrhage which produced partial blindness." In a short time his speech became normal and in about six or eight weeks he was able to be about the house and grounds. During the following summer he was quite feeble and did very little work. His death was caused by Bright's disease, and the master reports that, "Bright's disease in its progress tends to weaken and otherwise impair the mental faculties and physical action, and to break down the nervous system; it causes a degeneration of the arteries in all parts of the body. The arteries become brittle and predisposed to hemorrhage." The master further finds: "That the shock which said John M. Allen had on May 7, 1889, seriously and permanently affected his physical health and mental faculties; that from and after that date, and during the remainder of his life, by reason of said shock and its results, and concurrent impairment of his body and mind made by Bright's disease, said John M. Allen was sick in body, weak in will power and intellectual grasp, became childish, was forgetful, and was wholly incompetent rationally to consider, weigh and determine what was for and what was against his interest, or to transact business affairs, the nature, importance and character of which would require the exercise of a sound and disposing mind. That the execution of said deed, dated January 13, 1890, purporting to be a deed of conveyance of certain lands and premises therein described, to said Walter C. Dunton from said John M. Allen, was not the free act and deed of said John M. Allen, and that his signature to said deed was procured by the undue influence and fraud of said Lucy J. Allen and said Lee K. Osgood, and that the writing of his signature to said deed was not the free act and deed of said John M. Allen. That the signature of said John M. Allen to said contract and said power of attorney, both dated February 13, 1890, were procured by

the undue influence and fraud of Lucy Jane Allen and said Lee K. Osgood; that the writing of his signature to said contract and said power of attorney by said John M. Allen, and the pretended execution thereof by him, were not his free act and deed. That on said January 13, 1890, and on said February 13, 1890, and from said first named date through his natural life, said John M. Allen was mentally incapable of properly understanding and comprehending the scope and effect of said deed, and of said contract and said power of attorney, or of entering into any valid contract, deed or conveyance of the magnitude and importance of said deed, and said contract, and said power of attorney."

The bill prays that said Moore-Osgood contract and said power of attorney and said deeds be set aside and declared null and void, and that the defendants account for the money, personal property, real estate, and all other property which came into their possession, by virtue of said contracts.

*Butler & Moloney,* and *George E. Lawrence* for the orators.

*Marvelle C. Webber* and *E. L. Waterman* for the defendants.

A court of chancery will not set aside a conveyance, if the grantor, at the time he executed it, had sufficient understanding to know the nature and consequence of his act; and the burden of proof is on the party seeking to set the conveyance aside. *Morse* v. *Slason,* 13 Vt. 296; *Day* v. *Seeley,* 17 Vt. 542; *Mann* v. *Betterly,* 21 Vt. 326; *Willard* v. *Dow,* 54 Vt. 188; *Doty* v. *Hubbard,* 55 Vt. 278; *Stewart* v. *Flint,* 59 Vt. 144; *King* v. *Davis,* 60 Vt. 502; *Dennett* v. *Dennett,* 44 N. H. 538; 5 Am. & Eng. Enc. 426; *Seaver* v. *Phelps,* 11 Pick. 304; *Howe* v.

*Howe,* 99 Mass. 88; *Hovey* v. *Hobson,* 55 Me. 256; *Miller* v. *Craig,* 36 Ill. 109; *Corbit* v. *Smith,* 7 Iowa 60, 71 Am. Dec. 431; *Ramsdell* v. *Ramsdell,* 128 Mich. 110; *Weller* v. *Weller,* 112 Ill. 655; *Shea* v. *Murphy,* 164 Ill. 614; *Bowdoin College* v. *Merritt,* 75 Fed. 480; *Doe* v. *Beeson,* 2 Houston (Del.) 246; *Farnsworth* v. *Nofsinger,* 46 W. Va. 410, 13 Cyc. 738, (b) notes 62-64; 11 Am. & Eng. Enc. 146-147 notes, especially note 1; 25 Am. & Eng. Enc. 992 *et seq.* and note 4.

Influence to be "undue" must be such as to destroy free agency, and to substitute the will of another for that of the person nominally acting.    13 Cyc. 585 (5); 27 Am. & Eng. Enc. 453; *Foster's Exrs.* v. *Dickerson,* 64 Vt. 233, 265; *Thornton's Exrs.* v. *Thornton's Heirs,* 39 Vt. 122; *Howe* v. *Howe,* 99 Mass. 88, 99; *Corbit* v. *Smith,* 7 Iowa 60; *Sawyer* v. *White,* 122 Fed. 58.

Where it is objected that the master received improper testimony, advantage thereof may be taken by motion to recommit the report, as well as by exceptions thereto.    *Johnson's Admr.* v. *Dexter,* 37 Vt. 641; *Wilder* v. *Stanley,* 49 Vt. 105; *Graham* v. *Stiles,* 38 Vt. 578; *Walton* v. *Walton's Est.,* 63 Vt. 513.

Execution of a deed in the presence of an attesting witness is evidence of a delivery, even though the deed remains in the grantor's hands.    *Moore* v. *Hazelton,* 9 Allen 102; *Howe* v. *Howe,* 99 Mass. 88.

MILES, J.    The first ground of objection to the action of the court below, is based upon the refusal of that court to recommit the special master's report.    This objection cannot avail the defendant, because the recommittal of the report was a matter within the discretion of the chancellor, and no abuse of that discretion appearing, this Court will not review the

action of that court.   *Lovejoy* v. *Churchill,* 29 Vt. 151; *Fuller* v. *Wright,* 10 Vt. 512-514; *Morse* v. *Beers,* 51 Vt. 359; *Robinson* v. *Dodge,* 66 Vt. 595; *Pease* v. *Stevens,* 74 Vt. 215, and cases cited; *Sowles* v. *Sartwell,* 76 Vt. 70.

This holding dispenses with the necessity of considering the affidavits furnished with the case, for their only bearing was upon the question of recommittal.   The defendants, however, argued to some extent, that they furnish ground for a new trial, because they show that the findings of the master are without the support of evidence.   In this, we think the position of the defendants is not well taken, and that the affidavits do show that there was some evidence supporting each finding of the master.   Whether such evidence was sufficient to constitute a fair balance upon all the facts reported, we have not considered, as that is unnecessary, in any view of the case, for this Court will not revise or review the master's findings, unless fraud or corruption is shown, when there is evidence to sustain them. *Security Co.* v. *Bennington M. Association,* 70 Vt. 201-215, and cases cited; *Sargent* v. *Burton,* 74 Vt. 24-27.   If this were not so, the affidavits could not be used for this purpose; because this case is not before us upon a petition for a new trial, but it is an appeal from the action of the court below, and the grounds upon which the defendants seek a reversal are based upon the alleged errors of that court; and neither can they be used to set the report aside on the ground that it was unsupported by evidence; because those affidavits do not disclose all the evidence produced before the master and from which his report is made, so that this Court can say, if the affidavits themselves did not show it, whether there was or was not any such evidence before the master.

The defendants moved the court below for leavē to file exceptions to the master's report and rulings excluding evi-

dence, but they do not urge upon us the refusal of the court to grant that motion, as a ground of error, but do urge that we, as a matter of equity, ought to grant it and send down to the court of chancery a mandate to that effect. The case does not show that the master was requested in writing to report any testimony received or rejected by him, and the report does not show that any was received or rejected by him against the objection and exception of the defendants. Unless so requested the master is not obliged to state his decision in admitting or rejecting evidence, and may treat the objection as waived. Sec. 939, V. S.; *Winship* v. *Waterman,* 56 Vt. 181; *Scofield* v. *Stoddard,* 58 Vt. 290. Being waived, if they were ever made in fact, they stand as if they had never been made before the master, and not having been taken before the master, they could not be filed with the report in the court of chancery, and hence could not be considered by this Court. Sec. 942, V. S.; *Winship* v. *Waterman, supra; Scofield* v. *Stoddard, supra; Bruce* v. *Life Ins. Co.,* 58 Vt. 253; *Baxter, Admr.* v. *Blodgett et al.,* 63 Vt. 629.

The remaining question presented involves the orator's right to any decree as well as to the decree made, and as none of the testimony is before us, that right must be determined from the facts stated in the report of the special master.

The orators rest their right to the decree rendered upon the claim, that their intestate, John M. Allen, on the 13th day of January, 1890, and from thence to the time of his death, had not sufficient mental capacity to make the contracts and deeds which the defendants claim he then and subsequently made, and which the orators seek to avoid in this suit; and that undue influence was used upon him by the defendants' testatrix and the defendant, Lee K. Osgood, to secure the execution of those deeds and contracts.

The master has found in express terms that John M. Allen, the orators' intestate, was mentally incapable of properly understanding and comprehending the scope and effect of said deeds and contracts or of entering into any valid contracts, deed or conveyance of the magnitude and importance of said deed and said contract and power of attorney, and that the signature of the orator's intestate to the deed, contract and power of attorney was procured by the undue influence of the defendants' testatrix and the defendant, Lee K. Osgood.    These were findings upon the questions submitted to the master, and are findings upon the questions on which the orators' right to the decree rendered, rests; and, if there is no legal or equitable objection to the master's findings as stated, the orators are entitled to a decree.

The defendants, however, claim that these findings of the special master are simply legal conclusions and are not findings of fact, and that he has not found any facts which justify him in reporting such conclusions, and that therefore, the finding being upon a mixed question of law and fact, unsupported by other facts, the decree of the court of chancery ought to be reversed and the bill dismissed.

It is true that, at least a part of that finding is upon a mixed question of law and fact.    That part of the finding which states that the contract, deed, and power of attorney were procured by the undue influence and fraud of Lucy J. and Lee K., is undoubtedly a finding based upon law and fact.    The finding, that orators' intestate "was mentally incapable of properly understanding and comprehending the scope and effect of said deed, contract and power of attorney, or of entering into any valid contract, deed or conveyance of the magnitude and importance of said deed and said contract and power of attorney," is only a finding that the orators' intestate was mentally

incapable of understanding and comprehending what he did
when he executed the papers in question and is merely the find-
ing of a fact; but assuming that the entire facts found were
findings upon questions of mixed law and fact, this Court
would not be justified in reversing the decree and dismissing
the bill.    While it is the better practice, no doubt, to report all
the facts upon which an ultimate finding is based, it is not legal
error to omit to do so, even though the finding be a conclusion
resulting from mixed questions of law and fact.    *Winship* v.
*Waterman,* 56 Vt. 181-185.

This holding entitles the orators to a decree, without con-
sidering the question of whether the other facts found show
incapacity or fraud and undue influence or both; but in view
of the fact, that the defendants claim they do not, and that they
are the only foundation upon which the master's ultimate find-
ing of incapacity and undue influence rests, a claim, we think,
not supported by the report, we have thought best to consider
the case in that view.

It would contribute nothing to the law of the case to enter
into an exhaustive analysis and logical arrangement of the re-
ported facts.    It is sufficient to call attention to enough of these
facts to illustrate the reasons of our conclusions and the applica-
tion of the law to this and similar cases.

No clear and definite rule can be laid down, defining mental
incapacity and undue influence, which will apply in all cases and
upon which the court can rely as a foundation for granting or
refusing the prayer of a bill to set aside a conveyance alleged to
have been made under such influence.    Each case, therefore,
must, to a certain extent, rest upon its own peculiar circum-
stances.    Some of the principles which enter into all such ques-
tions have been settled by adjudication, and among those prin-
ciples which have been settled in this State, is that which re-

quires the mèntal incapacity of him on whose account the contract is sought to be set aside, on the sole ground of mental incapacity, to be such as leaves him without understanding to know the consequence of his own act.    *Morse* v. *Slason,* 13 Vt. 296; *Day* v. *Seeley,* 17 Vt. 542; *Willard* v. *Dow,* 54 Vt. 188; *Stewart* v. *Flint,* 59 Vt. 144, and cases cited in the opinion; *Greer* v. *Greer,* 9 Grattan, 330; *Newhouse* v. *Goodwin,* 17 Barbour 236; *Brown* v. *Torrey,* 24 Barbour 583; *Van Alst* v. *Hunter,* 5 Johns. Ch. 148; *Stuart* v. *Lispenard,* 26 Wend. 255; *Stone* v. *Damon,* 12 Mass. 488; *Farman* v. *Brooks,* 9 Pick. 212.    It is equally well settled, that a hard bargain or inadequate consideration, standing alone, does not furnish sufficient ground, under ordinary circumstances, for interference by the court of chancery.    *Mann* v. *Betterly,* 21 Vt. 326; White & Tudor's Leading Cases in Eq., Hare & Wallace's Notes, Vol. III, p. 136; but inadequacy of consideration, coupled with such a degree of mental weakness as would justify the inference that an advantage had been taken of that weakness, will furnish sufficient ground for equitable interference.    *Mann* v. *Betterly, supra.*    The rule is well stated in White & Tudor's Leading Cases in Equity, Vol. III, p. 136, wherein it is said: "A chancellor will not, therefore, interfere under ordinary circumstances, on the ground of mental weakness or of inadequacy of consideration, so long as either stand alone; and there is no reason for supposing that one has led to, or resulted in the other.    When, however, both these elements are present, the case changes its aspect, and there will be ground for an inference that the inadequacy is due to the exercise of undue influence, or that undue advantage has been taken of the weakness, and equity will set the whole transaction aside, unless this presumption is rebutted."    After citing authorities, the author proceeds to say: "Hence, while proof that the powers of one of

the parties to a contract were changed or enfeebled, may be nothing in itself," citing authorities, among which is *Mann* v. *Betterly, supra,* "it will be everything when the bargain is one that no man, in the full possession of his faculties, would have made, and that no man should have made with another who had lost the power of taking care of himself." To this statement of law he cites a large number of cases, among which are again cited *Mann* v. *Betterly, supra,* and *Conant* v. *Jackson,* 16 Vt. 335. He also states the rule on p. 122 of the same volume, to be as follows: "In the absence of any special relation between the parties, where a party *gains a great advantage over* another, by a voluntary instrument, the burden of proof is undoubtedly thrown upon the person receiving the benefit, and he is under the necessity of showing that the transaction is fair and honest." To this proposition of law the author again cites a long list of authorities.

These rules, however, are somewhat modified in case of a gift or advantageous contract to a wife, and while the authorities are not harmonious in this regard, the weight of authority seems to support this modification. White & Tudor's Leading Cases in Equity, Vol. III, p. 144. The modification simply consists in requiring the party setting up incompetency and undue influence, to prove it, notwithstanding that the contract was for the benefit of the wife and rested upon an inadequate consideration, if the case was otherwise free from suspicion, the presumption being that it was an advancement to the wife.

Now, applying these general and elementary rules of law to the facts reported by the master, can we say that there are no reported facts supporting the master's finding of incapacity and undue influence?

To begin with, the master has reported that at the time the contracts were made, the orators' intestate was an old man

seventy-four years of age, afflicted with Bright's disease, who had received a severe shock about eight months before the papers in question were made, rendering him partially blind, weak in will power and intellectual grasp, who was childish, forgetful, wholly incompetent rationally to consider, weigh and determine what was for or against his interest, and who was wholly incompetent to transact business affairs requiring the exercise of a sound and disposing mind, and who usually had an attendant when he went outside the house, and, at the time the papers were made, was surrounded by the relatives of the wife and the persons to be benefited by the contract, who advised concerning and composed the terms of the contract, with none of his relatives present, conveying away over thirteen thousand dollars of his property without any consideration whatever or any valid reason shown why he made the contract, leaving him destitute of all property, except three notes of one thousand dollars each against the defendant Osgood, which he afterwards gave to said Osgood, so that at the time of his death, Nov. 1, 1893, his estate inventoried only $371.40, being insufficient to pay his outstanding debts, costs of administration and funeral expenses. As we look into the contracts made at that time, which constitute a part of the report, we can hardly find a paragraph made in the interest of John M. The power of attorney from John M. and Lucy J. to Lee K. gives him full and unlimited power to sell and dispose of that property as he sees fit and for such sum as he may fix, and the proceeds thereof receive to himself, taking from him no security, notwithstanding that he then owed John M. and Lucy J. more than three thousand dollars of unsecured indebtedness.

We might proceed farther in the statement of additional facts found by the master; but enough has been already enumerated to justify him in finding his ultimate facts of incapacity

and undue influence as applied to the well settled principles of law.

The holding of this Court in *Mann* v. *Betterly,* 21 Vt. 326, *supra,* is a far stronger holding than is required to be made in the case at bar. There the mental capacity was stated to be "of weak understanding and capacity for the transaction of business; that in point of intellect he was not upon an equality with mankind in general." The Court says in reference to this, that such imbecility alone is not sufficient; but "when coupled with gross inequality in the contract, may be sufficient to justify the inference of fraud and imposition"; and then goes on to consider whether there was gross inadequacy of consideration, not finding it, the bill is dismissed; but the case clearly shows that if the court had found that fact, it would have sustained the bill.

In the case at bar, the mental capacity is found to be much lower than in the case cited and the contract is without any consideration whatever. This in itself, without alluding to the many other facts found indicating undue advantage, under the rule laid down in *Mann* v. *Betterly, supra,* is sufficient to sustain the bill, in view of the fact that nothing appears in the report to rebut the presumption of incapacity and undue influence combined. The deeds and contracts themselves, showing that John M. gained nothing by them and lost everything, with the surrounding circumstances, called for clear reasons for making them; but no facts are found by the master why they were made, except the incapacity and undue influence. These conclusions are not affected by the fact that the deed was to the wife, for that fact only affects the question of upon whom the burden of proof lies, the presumption, in case of a wife, being that it was made as an advancement. White & Tudor's Leading Cases in Eq., Vol. III, p. 144; but in this case, that pre-

sumption is rebutted by the facts found, from which it clearly appears that the conveyance was made for the purpose of divesting the heirs of John M. of all chance to inherit any of his property, and to place it in the wife so it would ultimately pass to her heirs.

*Decree affirmed so far as the same relates to real and personal property now in the possession of the defendants or either of them, or to which they or either of them are entitled, embraced or described in said contract, deeds and power of attorney, and claimed by said defendants by, through or on account of the same; and so far as the same relates to an accounting by the said defendants and the surrender to the orators of all sums of money that may have been collected by said defendants or either of them, or that have come into their hands or possession, belonging to the estate of said John M. and so far as relates to the surrender to the orators of all kinds of property that came into the possession of the said Osgood, Barrett and Dana under and by virtue of said deeds, contract and power of attorney and which they have not disposed of to bona fide purchasers without notice; and so far as the same relates to the contract between said Osgood and said Moore remaining unexecuted at the time the bill in this cause was brought; and so far as the same relates to the injunction; but the same is reversed so far as it relates to real and personal property conveyed by the said Osgood, Dana, Barrett and Moore to bona fide purchasers without notice; and the cause is remanded with mandate to the court of chancery to refer the same to a master to take an account of the property, whether real, personal or mixed, which has come to the hands and possession of the defendants or either of them from the estate of the said John M. Allen, by virtue of a claim of right resting upon said contract, deeds and power of attorney, and also to take an account of*

*all money which said defendants or either of them have received from the sale of any and all such property or which they or either of them may have received on account thereof, and to report to said court of chancery the location and value of said property and the amount of money, if any, which they or either of them have received from the sale of any of said property, whether sold by themselves or by their agent, and, if it shall be found that sales have been made and money received therefor, to report to whom and for how much the sale was made and whether to a bona fide purchaser with notice or otherwise, and when said report is made and returned to said court of chancery, such decree is to be entered thereon, in addition to the decree already rendered and affirmed herein, as the facts reported warrant.*