WHITCHURCH v. CRAWFORD et al.
No. 1507.

Circuit Court of Appeals, Tenth Circuit.
Sept. 7, 1937.

Guy H. Sigler, of Ardmore, Okl. (P.
M. Jackson, of Ardmore, Okl., on the
brief), for appellant.

Charles N. Champion, of Muskogee,
Okl. (Cleon A. Summers and C. W. Miller,
both of Muskogee, Okl., on the brief),
for the United States.

C. L. McArthur, of Ada, Okl. (W. F.
Rampendahl, of Muskogee, Okl., E. W.
Kemp and Joseph W. Hayes, both of Ada,
Okl., and R. A. Keller and C. W. Cameron,
both of Marietta, Okl., on the brief), for
appellee Watson Palmer.

Before PHILLIPS and BRATTON,
Circuit Judges, and KENNEDY, District
Judge.

PHILLIPS, Circuit Judge.

Under the Supplemental Agreement
with the Choctaws and Chickasaws of July
1, 1902 (32 Stat. 641, c. 1362), there was
duly allotted to Elizabeth Brown, a full-
blood Chickasaw Indian, enrolled opposite
Roll No. 47, as her homestead allotment,
the north half of the northeast quarter
and the southeast quarter of the north-
east quarter of Section 33 and the south-
west quarter of the southeast quarter of
Section 32, Township two, North, Range
seven, East, Pontotoc County, Oklahoma.
A patent therefor was duly issued and
delivered to Elizabeth Brown. She died
intestate in the year 1907, prior to the ad-
mission of the state of Oklahoma into the
Union. She left surviving her the follow-
ing heirs: A daughter, Rosa Bean, a full-
blood Chickasaw Indian, enrolled as such
opposite Roll No. 48; a daughter, Phoebe
Brown, a full-blood Chickasaw Indian, en-
rolled as such opposite Roll No. N. B. 346;
a son, Andy Brown, a full-blood Chickasaw
Indian, enrolled as such opposite Roll No.
50; a son, Scott Brown, a full-blood Chick-
asaw Indian, enrolled as such opposite Roll
No. 49; a son, Charley Brown, a full-blood
Chickasaw Indian, born after March 4,
1906, and not enrolled, and her husband,
Levi Brown, a full-blood Chickasaw Indian,
enrolled as such opposite Roll No. 146.

Levi Brown is still living. Phoebe
Brown died in the year 1919, while a minor,
unmarried and without issue. Andy Brown
died in the year 1922 leaving as his sole
and only heirs at law, his wife, Clara
Brown, now Clara Gibson and one son,
Wilson James Brown. Rosa Bean died in
1927. She left as her surviving heirs at
law her husband, Hicks Palmer, a full-
blood Choctaw Indian, enrolled as such
opposite Roll No. 11518, her brothers, Scott
Brown and Charley Brown, and her
nephew, Wilson James Brown, a son of her
predeceased brother, Andy Brown, all full-
blood Indians.

Rosa Bean owned, at her death, an un-
divided one-fourth interest in the allot-
ment which she took by inheritance from
her mother, Elizabeth Brown. Hicks
Palmer died December 21, 1930, owning
an undivided one-eighth interest in the al-
lotment which he took by inheritance
from his deceased wife, Rosa Bean. Hicks
Palmer left surviving him as his sole heir
at law, Watson Palmer, a full-blood Choc-
taw Indian enrolled opposite Roll No.
11517.

On February 6, 1935, Watson Palmer
and Emma Palmer, his wife, executed and
delivered to Clifford G. Whitchurch a
deed purporting to convey to Whitchurch
an undivided one-sixteenth interest in the
allotment. On or about the same date,
Watson Palmer executed and delivered
to D. D. Brunson a contract to convey a
one-sixteenth interest in such allotment
to Brunson. The deed and contract were
not approved by the county court having
jurisdiction of the estate of the deceased
allottee, nor by any other county court in
the state of Oklahoma, nor by the Secretary
of the Interior.

Clifford G. Whitchurch brought this
suit in the District Court of Pontotoc
County, Oklahoma, against Vol Crawford
and others to quiet the title to an undivided
one-sixteenth interest in the allotment.
Notice was served on the Superintendent
of the Five Civilized Tribes under section
3 of the Act of April 12, 1926, 44 Stat.
240, and the United States removed the
cause to the Federal court. See Fish v.
Kennamer (C.C.A.10) 37 F.(2d) 243, 245.

The plaintiff filed a motion to remand
on the ground the lands involved were un-
restricted. The motion was denied. The
United States then filed an intervening pe-
tition in behalf of Watson Palmer. It at-
tacked the validity of the conveyance from
the Palmers to Whitchurch and the con-
tract with Brunson on two grounds: (1)
Want of requisite approval, and (2) in-
competency, fraud and misrepresentation.

From a decree in favor of the United States and Palmer, Whitchurch has appealed.

## I. Restrictions against Alienation

By section 19 of the Act of April 26, 1906 (34 Stat. 137, 144), lands of full-blood Indians of the Choctaw, Chickasaw, Cherokee, Creek and Seminole Tribes were restricted against alienation for the period of twenty-five years from and after the approval of such act.

By section 22 of such act (34 Stat. 145), lands of full-blood Indian heirs were subjected to a qualified restriction in that conveyances made under the provisions of such section were subject to approval by the Secretary of the Interior.

Section 1 of the Act of May 27, 1908 (35 Stat. 312) removed restrictions against alienation as to certain lands of certain designated classes of allottees. It provides that homesteads of allottees of half or more Indian blood and all allotted lands of enrolled full-bloods and enrolled mixed bloods of three quarters or more Indian blood shall not be subject to alienation prior to April 26, 1931, except that the Secretary of the Interior may remove such restrictions under rules and regulations respecting terms of sale and disposal of the proceeds, prescribed by him for the benefit of the Indian allottees.

Section 9 of the Act of May 27, 1908 (35 Stat. 315), provides:

"That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: *Provided, That no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee:* Provided further, That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March fourth, nineteen hundred and six, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section one hereof, for the use and support of such issue, during their life or lives, until April twenty-six, nineteen hundred and thirty-one; but if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from all restrictions; if this be not done, or in

the event the issue hereinbefore provided for die before April twenty-six, nineteen hundred and thirty-one, the land shall then descend to the heirs, according to the laws of descent and distribution of the State of Oklahoma, free from all restrictions." (Italics ours.)

Section 1 of the Act of Congress approved April 12, 1926 (44 Stat. 239) provides:

"That section 9 of the Act of May 27, 1908 (Thirty-fifth Statutes at Large, page 312), entitled 'An Act for the removal of restrictions on part of the lands of allottees of the Five Civilized Tribes, and for other purposes,' be, and the same is hereby, amended to read as follows:

"'Sec. 9. The death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, That hereafter no conveyance by any full-blood Indian of the Five Civilized Tribes of any interest in lands restricted by section 1 of this Act acquired by inheritance or devise from an allottee of such lands shall be valid unless approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee or testator.'"

The Act of May 10, 1928 (45 Stat. 495), so far as here material, reads:

"Sec. 1. That the restrictions against the alienation, lease, mortgage, or other incumbrance of the lands allotted to members of the Five Civilized Tribes in Oklahoma, enrolled as of one-half or more Indian blood, be, *and they are hereby, extended for an additional period of twenty-five years* commencing on April 26, 1931: Provided, That the Secretary of the Interior shall have the authority to remove the restrictions, upon the applications of the Indian owners of the land, and may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe.

"Sec. 2. That the provisions of section 9 of the Act of May 27, 1908 (Thirty-fifth Statutes at Large, page 312), entitled 'An Act for the removal of restrictions from part of the lands of allottees of the Five Civilized Tribes, and for other purposes,' as amended by section 1 of the Act of April 12, 1926 (Forty-fourth Statutes at Large, page 239), entitled 'An Act to amend section 9 of the Act of May 27, 1908 (Thirty-fifth Statutes at Large, page

312), and for putting in force, in reference to suits involving Indian titles, the statutes of limitations of the State of Oklahoma, and providing for the United States· to join in certain actions, and for making judgments binding on all parties, and for other purposes,' *be, and are hereby, extended and continued in force for a period of twenty-five years from and including April 26, 1931, except, however, the provisions thereof which read as follows:*

" 'Provided further, That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March 4, 1906, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior for the use and support of such issue, during their life or lives, until April 26, 1931; but if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from restrictions; if this be not done, or in the event the issue hereinabove provided for die before April 26, 1931, the lands shall then descend to the heirs, according to the laws of descent and distribution of the State of Oklahoma, free from all restrictions: Provided, That the word "issue", as used in this section, shall be construed to mean child or children: Provided further, That the provisions of section 23 of the Act of April 26, 1906, as amended by this Act, are hereby made applicable to all wills executed under this section: which quoted provisions be, and the same are, repealed, effective April 26, 1931.' * * *

"Sec. 5. That this Act shall not be construed to reimpose restrictions heretofore or hereafter removed by the Secretary of the Interior or by operation of law." (Italics ours.)

The Act of January 27, 1933 (47 Stat. 777), so far as here material, reads:

"That all funds and other securities now held by or which may hereafter come under the supervision of the Secretary of the Interior, belonging to, and only so long as belonging to Indians of the Five Civilized Tribes in Oklahoma of one-half or more Indian blood, enrolled or unenrolled, are hereby declared to be restricted and shall remain subject to the jurisdiction of said Secretary until April 26,. 1956, subject to expenditure in the meantime for the use and benefit of the individual Indians to whom such funds and securities belong, under such rules and regulations as said Secretary may prescribe: Provided, That where the entire interest in any tract of restricted and tax-exempt land belonging to members of the Five Civilized Tribes is acquired by inheritance, devise, gift, or purchase, with restricted funds, by or for restricted Indians, such lands shall remain restricted and tax-exempt during the life of and as long as held by such restricted Indians, but not longer than April·26, 1956, unless the restrictions are removed in the meantime in the manner provided by law: *Provided* further, That such restricted and tax-exempt land held by anyone, acquired as herein provided, shall not exceed one hundred and sixty acres: *And provided further,* That all minerals including oil and gas, produced from said land so acquired shall be subject to all State and Federal taxes as provided in section 3 of the Act approved May 10, 1928 (45 Stat.L. 495). * * *

"Sec. 8. That it shall be the duty of the attorneys provided for under the Act of May 27, 1908 (35 Stat.L. 312), to appear and represent any restricted member of the Five Civilized Tribes before the county courts of any county in the State of Oklahoma, or before any appellate court thereof, in any manner in which said restricted Indians may have an interest, *and no conveyance of any interest in land of any full-blood Indian heir shall be valid unless approved in open court after notice* in accordance with the rules of procedure in probate matters adopted by the Supreme Court of Oklahoma in June of 1914, and said attorneys shall have the right to appeal from the decision 'of any county court approving the sale of any interest in land, to the district court of the district to which the county is a part. Approved, January 27, 1933." (Italics ours.)

In a letter to the chairman of the House Committee on Indian Affairs relative to the 1933 Act above set out, the Secretary of the Interior in part said:

"Department of the Interior,

"Washington, February 1, 1932.

"Hon. Edgar Howard,

"Chairman Committee on Indian Affairs, "House of Representatives.

"My Dear Mr. Chairman: I transmit a draft of bill relating to restrictions affecting members of the Five Civilized Tribes of Indians of Oklahoma.

"This draft follows in general language Senate bill No. 6169, as amended and pass-

ed by the House during the last session of Congress, except the last proviso thereof which has been added as a new provision. (See Congressional Record of March 3, 1931, vol. 74, p. 7219.) * * *

"The last provision of section 2 of the inclosed draft, which is the only matter included that was not contained in S. 6169 as passed by the House during the last session of Congress, we deem a wise one and worthy of enactment. Experience has shown that hasty sales are frequently consummated by Indian heirs of varying degrees of competency, immediately following the death of an ancestor, and serious questions are later raised as to the interest of heirs; titles are attacked, and much costly litigation ensues.

"I recommend the early consideration and enactment of the inclosed draft of bill.
"Very truly yours,
"Ray Lyman Wilbur, Secretary."

The homestead of Elizabeth Brown was restricted under the second proviso of section 9 of the Act of May 27, 1908 until April 26, 1931, because she died leaving a surviving son, Charley Brown, born after March 4, 1906. Holmes v. U. S. (C.C.A. 10) 53 F.(2d) 960, 963; Johnson v. U. S. (C.C.A.10) 64 F.(2d) 674.

It is contended that since Watson Palmer took not directly, but through remote inheritance from the deceased allottee, Elizabeth Brown, the lands were not restricted under the provisions of the Act of April 12, 1926. While it seems to be the fixed policy of the Congress to maintain qualified restrictions against alienation by full-blood Indian heirs, we find it unnecessary to determine whether the last mentioned act applied to the lands here involved.

Watson Palmer, being a full-blood Indian heir, falls clearly within the purview of the Act of January 27, 1933, and if restrictions had been removed from such land while held by Hicks Palmer and Watson Palmer, they were reimposed by the latter act and the approval of a county court of Oklahoma was a prerequisite to the validity of the deed to Whitchurch and the contract with Brunson. The power of Congress to constitutionally reimpose such restrictions is no longer open to question. McCurdy v. U. S., 246 U.S. 263, 273, 38 S.Ct. 289, 62 L.Ed. 706; Brader v. James, 246 U.S. 88, 96, 38 S.Ct. 285, 62 L.Ed. 591; Hickey v. U. S. (C.C.A.10) 64 F.(2d) 628, 631; Tiger v. Western Investment Company, 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738.

We conclude the deed and contract are void for want of requisite approval.

## II. Fraud

Watson Palmer testified that he was a full-blood Choctaw Indian enrolled as such; that he was forty-one years of age, resided in Love County, Oklahoma, had attended school about two years, could sign his name but could read and write very little and could neither add nor subtract; that before sun-up on the morning of February 6, 1935, Hy Deskins came to the home of Watson Palmer and told the latter he wanted him to go to Ardmore to appear in court, that D. D. Brunson, Watson Palmer's attorney, would be in Ardmore and was going to appear for him in the Hicks Palmer will case; that Watson Palmer went to Sigler & Jackson's law office in Ardmore, Oklahoma, about nine o'clock of that morning; that Jackson, Sigler, Whitchurch and Deskins were at the office; that Brunson came in a little later; that all of the parties last mentioned talked to Watson Palmer about signing an oil lease; that Whitchurch and Deskins asked him to sign the papers and Brunson advised him to go ahead, stating that "he would stick with me"; that they did not explain to Watson Palmer that the instrument was a deed and that he signed it under the impression that it was an oil lease; that he received $25.00 on the day he signed the instrument and was told that he would receive $25.00 each month until he received a total of $250.00; that Deskins told him Brunson was going to appeal the Hicks Palmer will case and that Watson Palmer would get $25.00 per month while the case was pending on the appeal; that he did not know where the property embraced in the deal was located, did not know it was near an oil field and had no knowledge of its value. He further testified that at the same time he signed a contract with Brunson whereby he agreed to convey an undivided one-sixteenth interest in the allotment to Brunson.

Other witnesses who had known Palmer for many years testified that he had had very little education, was addicted to the use of intoxicating liquor and could be easily influenced and imposed upon and that, in their opinion, he was incompetent to handle his business affairs.

W. B. Osborn, who was engaged in the oil and gas business and was familiar

with the allotment in question and the value of oil and gas leases and royalties, testified that, in his opinion, in February, 1935, the portion of the allotment in section 32 had an oil and gas market value of $500.00 per acre and a royalty value of $250.00 per acre, and that the portion of the allotment in section 33 had an oil and gas market value of $1,000.00 per acre and a royalty value of $650.00 per acre.

G. C. Harris, who was engaged in the oil lease and royalty business and acquainted with the allotment in question, and the value of oil and gas leases and royalties, testified that, in his opinion, in February, 1935, the oil and gas lease and royalty value of the portion of the allotment in section 32 was $600.00 per acre and in section 33 from $1,000.00 to $1,250.00 per acre. He further testified that the reasonable market value of the surface in 1935 was $10.00 per acre.

D. D. Brunson filed an answer in the cause in behalf of Watson Palmer in which he set up facts showing that Watson Palmer had acquired a one-eighth interest in the allotment by inheritance, but wholly failed to set up any defense to the suit of Whitchurch.

The trial court found that Watson Palmer, at the time of the execution of the deed and contract, was wholly incompetent to manage his business affairs; that he was grossly ignorant of the value of real estate and of money; that he was addicted to the excessive use of intoxicating liquor; that the consideration paid was grossly inadequate and that the execution of the contract and deed by Watson Palmer was induced by fraud and misrepresentation. The court further found that the confidential relation of attorney and client existed between Watson Palmer and Brunson at the time such instruments were executed. It decreed cancellation of the contract and deed on the ground of want of requisite approval and fraud and misrepresentation.

■ Where a chancellor has considered conflicting evidence and has made his findings and decree thereon, they must be regarded as presumptively correct, and unless a serious mistake has been made in the consideration of the evidence or an obvious error has intervened in the application of the law, the decree should be permitted to stand.[1]

■ The acts and contracts of persons of weak understanding, and who are therefore liable to imposition, will be held void if the facts justify the conclusion that the party has not exercised a deliberate judgment but that he has been imposed upon, circumvented or overcome by cunning, artifice or undue influence and this is true though his mental weakness does not amount to insanity. The rule is especially applicable where the consideration given is wholly inadequate.[2]

■ The testimony fully supports the findings of the trial court and we conclude that the instruments in question were properly cancelled on account of the incompetency of Watson Palmer, the fraud practiced upon him, and the inadequacy of the considerations therefor.

The decree is affirmed.

[1] Standard Oil Co. of Colorado v. Standard Oil Company (C.C.A. 10) 72 F.(2d) 524, 527; Independent Oil Well Cementing Co. v. Halliburton (C.C.A. 10) 54 F.(2d) 900, 908; Clarke v. Hot Springs Electric Light and Power Co. (C.C.A. 10) 55 F.(2d) 612, 615.

[2] Logan v. Walker, 152 La. 880, 94 So. 430, 432; Sims v. Sims, 175 Ark. 1170, 1 S.W.(2d) 56, 57; Guenther v. Kurtz, 204 Iowa, 732, 216 N.W. 39, 40; Buchanan v. Wilson, 97 Neb. 369, 149 N.W. 802, 806; Williams v. Longman (Iowa) 78 N.W. 198; Douglas v. Ogle, 80 Fla. 42, 85 So. 243, 244; Howard v. Howard, 87 Ky. 616, 9 S.W. 411, 413, 1 L.R.A. 610; Mays v. Prewett, 98 Tenn. 474, 40 S.W. 483, 487; Allen's Adm'rs v. Allen's Adm'rs, 79 Vt. 173, 64 A. 1110; Highberger v. Stiffler, 21 Md. 338, 83 Am.Dec. 593, 598; Tracey v. Sacket, 1 Ohio St. 54, 59 Am.Dec. 610, 614; Ellis v. Mathews, 19 Tex. 390, 70 Am.Dec. 353, 356; Juzan v. Toulmin, 9 Ala. 662, 44 Am.Dec. 448, 454; Black on Rescission and Cancellation (2d Ed.) par. 265.